FILED

2005 Oct-21  PM 03:30
U.S. DISTRICT COURT
N.D. OF ALABAMA

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
MIDDLE DIVISION

THERON OLIVER,              }
                            }
     Plaintiff,         }
                            }     CIVIL ACTION NO.
v.                     }     04-AR-2684-M
                            }
THE COCA-COLA COMPANY and    }
BROADSPIRE SERVICES, INC.,    }
                            }
     Defendants.        }

## MEMORANDUM OPINION

Plaintiff, Theron Oliver ("Oliver"), invokes the Employee Retirement Income Security Act of 1974, 29 U.S.C. § 1001, *et seq.* ("ERISA"), seeking to recover long-term disability benefits from his former employer, The Coca-Cola Company ("Coca-Cola"), which is both the Plan Sponsor and the Plan Administrator of a Long-Term Disability Income Plan ("the Plan") in which Oliver was a participant. Oliver also sues Broadspire Services, Inc. ("Broadspire"), an entity that Oliver originally alleged to be the Plan Administrator but now contends was the "de facto" Plan Administrator. The court has before it the following ten motions, listed by dates of filing and not in order of importance:

    (1)  Oliver's motion for summary judgment against both defendants;

    (2)  Broadspire's motion for summary judgment;

    (3)  Coca-Cola's motion for summary judgment;

    (4)  Coca-Cola's motion to strike portions of Oliver's affidavit;

    (5)    Oliver's motion to strike portions of the affidavit of Courtney Trudeau submitted by Broadspire in support of its motion for summary judgment;

    (6)    Oliver's motion to compel Broadspire either to produce all documents requested by Oliver or to agree that no such documents exist;

    (7)    Oliver's motion to compel Broadspire to respond to Oliver's requests for production;

    (8)    Oliver's motion to compel Coca-Cola to respond to certain discovery requests;

    (9)    Oliver's motion for leave to amend his complaint to add a claim for medical benefits under the Coca-Cola Medical Benefit Plan that is separate and distinct from the Long-Term Disability Plan;

    (10)  Coca-Cola's motion to strike certain exhibits submitted by Oliver in opposition to Coca-Cola's motion for summary judgment.

These motions, on which oral argument has been heard, are supported and opposed by voluminous unashamedly partisan briefs and evidentiary materials, some filed long after oral argument and as recently as this week.  They present some interesting questions. If the court should undertake to address every argument put forward by every party on every issue, this opinion would put to sleep even the most avid reader of ERISA esoterica.


### Broadspire's Motion for Summary Judgment

Broadspire says that because it was only the "**Claims** Administrator" and not the "**Plan** Administrator" for Coca-Cola's Plan, it was not an ERISA fiduciary and is thus immune from suit for any participation it had in the denial of Oliver's claim for

2

disability income.   The undisputed evidence is that Broadspire holds itself out to Coca-Cola and other ERISA plan sponsors as a claims processor that can save the sponsor money by aggressively reviewing disability claims.   The court is reminded of the conclusion it reached in *Florence Nightingale Nursing Home v. Blue Cross*, 832 F. Supp. 1436 (N.D. Ala. 1993), namely, that the claims administrator, Blue Cross, although not obligated to pay claims out of its own pocket, perfectly reflected the will of the plan sponsor, which funded the plan.   The reason for reaching that conclusion was Blue Cross's obvious, overriding interest in keeping its customer, the plan sponsor, happy.   It is also undisputed in the instant case that Broadspire (and one or more of its predecessor "claims administrators" under this Plan not here named) had such a heavy involvement in the consideration and denial of Oliver's thus far unsuccessful disability claim as to have been, as a practical matter, the actual decider.   Finally, it is clear that Broadspire did what Oliver is complaining about under the auspices of the "Administrative Services Agreement" that it had with Coca-Cola.   This contract gave Broadspire the exclusive and unbridled power to decide claims, while purporting to reserve the ultimate decision-making authority to itself as Plan Administrator and at the same time purporting to delegate that "final" authority to a Long-Term Disability Income Plan Committee ("the Committee"), the members of which were appointed by Coca-Cola.   "The Committee"

existed on paper, but exercised no independent judgment.  "The
Committee" was Coca-Cola for all intents and purposes, as was
Broadspire.  An appeal to "the Committee" from a Broadspire denial
was a quixotic formality.  In this case, Broadspire even
participated in Oliver's "appeal" to "the Committee" by
aggressively advocating the affirmance of its own denial of
benefits.  Could it be fairly thought to constitute "due process"
where a decision ostensibly being reviewed by an appellate entity
is overtly supported before the reviewing entity only by the party
whose decision is being reviewed?  But, then, ERISA has never
pretended to guarantee "due process".  If no other proof than this
strange procedure were available, it would provide proof enough to
convince this court that Broadspire was the agent of Coca-Cola, and
that its agency included doing what was in Coca-Cola's best
interest all the way.  The words "alter ego" come to mind.

> In its brief, Broadspire argues:

> The Plan, as amended, designates Coca-Cola as the Plan
> Administrator.

* * *

> As the Plan Sponsor and Administrator, Coca-Cola
> established the Long-Term Disability Income Plan
> Committee ("the Committee") and vested it with exclusive
> responsibility, discretion, and authority to construe the
> terms of the Plan and to determine eligibility of all
> participants to receive benefits and the amount of those
> benefits.

* * *

> The Plan is funded entirely by Coca-Cola through the

4

"Trust Forming a Part of The Coca-Cola Company Long-Term
Disability Income Plan".

*  *  *

The Trustee is The Northern Trust Company of Chicago,
Illinois.

Oliver admits, as he must, that Coca-Cola is named in the Plan as
Plan Administrator, but without difficulty, he has easily convinced
the court on the undisputed evidence that Broadspire was the *de
facto* or **real** Plan Administrator, and that "the Committee" was
never the real decision-maker, despite its theoretical, but
transparently illusory, existence.  There has been no attempt by
Coca-Cola to assert that Broadspire, or "the Committee", or The
Northern Trust Company of Chicago (where the money is warehoused),
is a necessary party.  Coca-Cola, in effect, admits that it is the
only necessary party defendant.

During oral argument Broadspire conceded that it was Coca-
Cola's agent at all times pertinent, so that any action it (or its
predecessor "claims administrators") undertook *vis-a-vis* Oliver,
was, in legal effect, the act of Coca-Cola.  Again, the words
"alter ego" come to mind.  When the court pressed Coca-Cola on this
point, Coca Cola was forced to admit that Broadspire was, in fact,
its exclusive agent in the processing of claims.  And, Coca-Cola
did not deny that Broadspire, as its agent, was cloaked with the
authority to make disability benefit decisions under the Plan.
Coca-Cola argues, however, that it successfully insulated itself

5

from ERISA fiduciary responsibility for any non-capricious denial of a disability claim, either by Broadspire or by "the Committee", by its formal delegation of full discretionary authority, not to Broadspire, but to "the Committee". This argument hangs on Coca-Cola's bare assertion that "the Committee" is a functioning separate entity that is ultimately and truly responsible for ruling on a claim after it has been initially decided by Broadspire. Coca-Cola must, of course, also satisfy the court that "the Committee" has been given the broad discretion first recognized in *Firestone Tire & Rubber v. Bruch*, 489 U.S. 101, 109 S. Ct. 948 (1989), as the means for creating the "arbitrary and capricious" standard of review that makes a court attack on the denial decision into a steep uphill battle.

In actual operation under the Plan, Broadspire receives an application for benefits, together with any evidentiary materials, conducts its own investigation to the extent it deems an investigation necessary, including the employment of evaluating physicians chosen by it, and either grants a claim without any subsequent review by "the Committee", or denies it, subject to review by "the Committee", that is, if a review is demanded by the claimant. How many times in the history of this particular contract between Coca-Cola and Broadspire "the Committee" has reversed a denial decision by Broadspire is conspicuously absent from the record. For aught appearing, it has never happened, or if

6

it has happened it was an aberration.  This is information that Oliver sought, but that defendants have not produced.  The court finds that such evidence would have been helpful, but is unnecessary to this decision.  Interestingly, "the Committee" has no contractual relationship with Broadspire.  Of course, if Broadspire is not an ERISA "fiduciary", as it contends, its obligation and loyalty is only to Coca-Cola, and it would owe no duty whatsoever to Oliver.

On the undisputed evidence, fairly construed against all of the movants, there is no practical reason for Broadspire to remain in the case inasmuch as its actions were, in fact and law, the acts of Coca-Cola, especially when Broadspire's own funds were never used to pay disability claims.  Because Coca-Cola acknowledges its responsibility for any of the shortcomings of Broadspire that might have created ERISA liability by Broadspire to Oliver, Broadspire may fairly be described as a redundant party.  It is Coca-Cola, the principal, and not Broadspire, the agent, that Oliver is, or should be, after.  The fact that Coca-Cola has not claimed that "the Committee" or the Northern Trust Company, are necessary parties can only be understood as an admission by Coca-Cola that it is the party financially and legally responsible for what ERISA obligations anyone may have to Oliver.

Assuming *arguendo* that Broadspire was a **mere** "claims administrator", it would be no more of an ERISA fiduciary than a

processing clerk or a consulting physician would be, no matter how crucial their contributions to the ultimate claims decision.  The court, however, does not accept Broadspire's assumption of a mere clerical role for itself.  It was a **fiduciary**, no matter what its title.  The court will therefore deny Broadspire's motion for summary judgment.  Consistent with the said denial, Oliver's cross-motion for summary judgment against Broadspire will rise or fall on how the court rules on Oliver's motion against Coca-Cola, Broadspire's principal.

### Coca-Cola's and Oliver's Cross-Motions for Summary Judgment

By their cross-motions for summary judgment, Coca-Cola and Oliver both say that no disputes of material fact exist, and that final judgment is due to be entered as a matter of law in favor of the competing movants.  They disagree on what make up the material facts and on what constitutes the law that leads inexorably to victory for one or the other.  The court agrees with both of them that there are no disputes of material fact and that the undisputed material facts form a basis for a dispositive ruling under Rule 56, F.R.Civ.P.  Some of the undisputed pertinent facts have already been set forth in the above section dealing with Broadspire, and will not be repeated.

The relevant provisions of Coca-Cola's Plan are these:

**Disability.   During the 24 months next following his Disability Date, the Participant will be considered to**

**have a Disability if a physical or mental illness or injury continuously disables him from performing his normal duties for his Employer, provided that he is not at any time engaged in any other occupation or employment for wage or profit as determined by the Administrative Services Provider. After the first 24 months, the Participant will be considered to have a Disability if a physical or mental illness or injury continuously disables him from engaging in any occupation for wage or profit, for which he is reasonably qualified by training, education or experience.**

\* \* \*

**Application for Benefits.**  As a condition to receiving a Disability Benefit, the Disabled Participant must submit a written application on a form provided by his employer, as soon as practicable after his Disability Date.  He must include with his application a medical certification of his Disability.

(a) **Initial.**  As a condition to receiving a Disability Benefit, the Disabled Participant may be required to submit to a physical and/or mental examination by, and receive a written certification of disability from a licensed medical doctor selected or approved by the Administrative Services Provider.  **The medical doctor's opinion will be binding on the Participant, the Plan and the Administrative Services Provider.**  The Plan will pay the cost of the examination.

(b) **Periodic.**  As a condition to continuing to receive Disability Benefit payments, the Disabled Participant must submit to medical examinations, and/or must provide written medical certification of his continued Disability, from time to time as required by the Committee.

\* \* \*

**Construction.  The Committee will have the exclusive responsibility and complete and final discretionary authority to construe the Plan and to decide all questions arising under the Plan**, except as delegated to the Assets Management Committee under Section 7.3, and all actions or determinations of the Committee shall be final, conclusive and binding.

9

**Right to Benefits.  The Committee will have the exclusive responsibility and the complete and final discretionary authority to determine the eligibility of all Participants to receive benefits and the amount of benefits to which any Participant may be entitled under the Plan**, and to enforce the claims procedure described in Section 7.12 and all actions or determinations of the Committee shall be final, conclusive and binding on all persons.

(emphasis supplied).

Effective January 1, 2002, after Oliver's claim had been denied by Broadspire and after that denial had been rubber stamped by "the Committee", the following provision was added to the Plan:

**Administrative Services Provider.**  To the extent the Administrative Services Provider has been delegated the responsibility to determine eligibility for benefits and benefit amounts under Section 7.12 and the claims procedure in the summary plan description for the Plan, **the Administrative Services Provider shall have the exclusive responsibility and the complete and final discretionary authority to determine the eligibility of all Participants to receive benefits and the amount of benefits to which any Participant may be entitled under the Plan**, to enforce the claims procedure described in Section 7.12 and in the summary plan description for the Plan, and **to construe the Plan and decide all questions arising under the Plan.  All actions of the Administrative Services Provider shall be final, conclusive and binding on all persons.**

(emphasis supplied).

How the "Administrative Services Provider" (a/k/a "claims administrator") and "the Committee" could both have "**final** discretionary authority" has not been explained, and defies explanation.  The court finds no amendment to the Plan that expressly takes away the ostensible final decision-making authority

10

from "the Committee".   If the amendment to the Plan enacted on January 1, 2002, was meant to replace "the Committee" with Broadspire as the final decision-maker, the change was technical only, because Broadspire, as "claims administrator", had, long before January 1, 2002, been the **actual** or *de facto* final decision-maker.   All the amendment of January 1, 2002, did was to acknowledge formally what had long been the truth, namely, that Broadspire (or one of its predecessor "claims administrators") is the final decision-maker.   In other words, the only difference the amendment of January 1, 2002, made was, for the first time, to give the Administrative Services Provider, **in writing**, the "complete and final discretionary authority" that the Supreme Court in *Bruch*, enunciated as the *sine qua non* for a plan sponsor to obtain the most deferential review of its ERISA benefits decision, making it much more difficult for a denial decision to be overturned in court than under a *de novo* consideration.   Coca-Cola obviously was taking advantage of *Bruch* when it purported to grant "full and complete discretionary authority" to "the Committee" but, **in fact, it thereafter treated Broadspire as the final decision-maker without granting it "full and complete discretionary authority" until January 1, 2002**.   Coca-Cola has thus presented this court with the obligation to examine Broadspire's decision, **made prior to January 1, 2002,** *de novo*.

     The fact that Broadspire was the *de facto* final decision-maker

eliminates the need to inquire into the serious question of conflict-of-interest by Broadspire and/or "the Committee" that would have created a "heightened arbitrary and capricious" standard of review. Because the review in this case is *de novo*, the questions of whether Broadspire's denial would be upheld under an "arbitrary and capricious" standard, or under a "heightened arbitrary and capricious" standard, are interesting, but they are hypothetical questions.

As the court has concluded, the standard of review is *de novo* despite the fact that Coca-Cola purported to give "full and complete discretionary authority" to "the Committee", an entity that Coca-Cola hoped would be perceived as the final decision-maker having *Bruch* discretionary authority. Although at all times pertinent, the Plan document did designate "the Committee" as having discretionary authority, facially meeting the *Bruch* criteria, the **real** authority was exercised by Broadspire, an entity that was the devoted agent of Coca-Cola **and that was not granted *Bruch* discretionary authority**. "The Committee" was never more than a figurehead for Coca-Cola and for Broadspire. It existed only as forensic window dressing. It was a will-o-the-wisp. Coca-Cola has offered no evidence other than the Plan document itself and "the Committee's" knee jerk concurrence in Broadspire's denial to suggest that Broadspire was not the **real** decision-maker. While "the Committee" was ostensibly given discretion, it failed to

exercise that discretion and instead abdicated in favor of a decision-maker that had no such discretion.  In order to take advantage of *Bruch*, an **actual** decision-maker must, **in fact**, exercise the discretion given it, something "the Committee" did not do.

To summarize, Coca-Cola has offered no proof of serious, independent, fair-minded review by "the Committee".  The totality of the evidence leads only to one conclusion, namely, that "the Committee" deferred to the "claims administrator" to the extent of rendering meaningless the discretion so carefully given "the Committee".  **A court is supposed to look through form to substance, and the substance here is that Broadspire was the final decision-maker without *Bruch* discretion.**

### The Merits of Oliver's Claim Under *De Novo* Consideration

Oliver was injured in an automobile collision on October 13, 1999.  He received six months of short-term disability benefits from Coca-Cola without any apparent argument.  The argument began when after six months Oliver applied for long-term disability.  The oft repeated reason articulated by Broadspire, and its chosen physicians, for denying Oliver's claim was a lack of "objective evidence" of an inability to work.  There is no requirement in the Plan document for such "objective evidence".  The idea of requiring "objective evidence" was the creation of the decision-maker.  Under the relevant provisions of the Plan, there are only two simple

13

questions to be answered:  (1) whether, during the eighteen month period after Oliver had received short-term disability for the six months after his accident, he was **continuously disabled from performing his normal duties**; and (2) whether, after the expiration of twenty-four months, Oliver was **continuously disabled from engaging in any occupation for wage or profit, for which he is reasonably qualified by training, education or experience**.  The Broadspire decisions on these fact questions were wrong.

The court is called upon to determine from the record evidence whether Oliver was "disabled" during two separate periods of time, as the term "disabled" is separately and differently defined in the Plan for the two periods.  Broadspire never voiced any distinction between Oliver's status or his ability to function in an employment environment during these separate periods of time.

If the Plan's unequivocal provision that the opinion of a medical doctor selected by Broadspire is "**binding on the Participant, the Plan and the Administrative Services Provider**", were taken seriously, the question recently addressed by the Seventh Circuit would need to be addressed.  In *Diaz v. Prudential Ins. Co. Of America*, 424 F. 3d 635 (7th Cir. 2005), the Seventh Circuit attempted to answer the question of what exactly are the magic words necessary to create the discretionary authority recognized by *Bruch* as critical to the standard of review.  If a doctor hired by Broadspire really had the absolute authority to

14

decide the whole matter, a very good argument could be made that Broadspire was granted the broadest *Bruch* authority, reaching its outside limit, subject to being reined in only when grossly abused, and could exercise that authority vicariously through its hired physician.  No such argument having been made by either defendant in this case, the court continues with its plenary review without pausing to agree or disagree with the recommendation of the Seventh Circuit that plans trying to get the most out of *Bruch* should simply provide in their plan document: Benefits under this plan will be paid only if the plan administrator decides in his discretion that the applicant is entitled to them". *Herzberger v. Standard Ins. Co.*, 205 F. 3d 327, 331 (7th Cir. 2000).

The court will not repeat all of the findings by Oliver's treating physicians, or the dismissive criticisms of those findings voiced by Broadspire's hired physicians.  Suffice it to say that the medical opinion evidence is substantial, if not overwhelming, that Oliver, who is, after all, not a world renowned physicist like Professor Hawking who can work productively while totally paralyzed in a wheelchair, is a person of not unlimited skill and education who was told by his own doctor not to return to work and who has been found by his treating neurologist to be totally disabled.  He is in constant pain.  The court will paraphrase, or reduce to narrative form, the opinion of the treating neurologist, Dr. Husham Mishu, M.D., as follows:

> I have treated Oliver since July 7, 2000.  My diagnosis is cervical radiculopathy with muscle spasms.  His symptoms include **severe pain in the cervical spine** radiating down his arm and center of back with associated muscle spasms.  Due to his symptoms, including side effects of his pain medication, oxycontin, Oliver is **not able to perform the substantial duties of his past work** as a system support specialist on a sustained basis.  Due to the symptoms of his condition and the side effects of his medication he has **lack of concentration, fatigue, drowsiness and other symptoms inhibiting his ability to mentally complete the most sedentary or basic work tasks.** Oliver's symptoms cause a **substantial impairment** in his ability to concentrate and focus on tasks.  He will be required to lie down periodically during the day due to his symptoms.  His **reliability** in most job settings would be poor.  His **pain and symptoms have been present since October 10, 1999, the day he became disabled.**

No one has suggested that Dr. Mishu is a complete charlatan or a fool when he recognizes pain and its side effects.  Pain that is not produced by a visually observable fracture or by a break in the skin is difficult, and sometimes impossible, to prove "objectively".  Is a grimace enough?  In this case, Dr. Mishu expressed himself on the subject this way:

> We did perform nerve conduction/EMG examination today which revealed a **C5 active and chronic radiculopathy on the right.**  The MRI study that he brought with him showed ligamentum flavum hypertrophy and a **C5 disk.**

If Dr. Mishu was lacking in "objectivity", so were Drs. Bell-Wade, Arrowsmith, Lazarus, and other medical professionals, all of whom confirmed Dr. Mishu's disability diagnosis and prognosis.  On the Broadspire side of the issue were several "peer review" opinions based on the review of the medical records by hired reviewers, including Dr. Goldberg, a doctor who never personally examined

16

Oliver, and, under similar circumstances, whose opinion has been severely criticized by at least two other federal district courts. Two courts found Dr. Goldberg lacking in objectivity because he had not considered pain and the effects of pain medication in making his disability determination. *See Fleming v. Kemper National Services*, 2005 WL 839639 (N.D. Calif. 2005), and *Hunter v. Federal Express Corp.*, 2004 WL 1588229 (E.D. Pa. 2004).

Although the award of Social Security disability benefits to Oliver does not constitute dispositive evidence of disability, it is evidence that bolsters the opinions of Drs. Mishu and the other **treating** physicians, to whom this court gives considerable deference. If the medical question were close, the Social Security determination would tip the balance in favor of Oliver. As it is, the court finds the treating physicians to be more credible than the physicians who were hired by Broadspire and paid by Coca-Cola.

In most factual disputes decided in a court of law, the fact-finder, whether it be court or jury, has the benefit of observing the demeanor of the witnesses, and, in the case of expert witnesses, the opportunity to explore their interest, if any, in the outcome, and their qualifications to express the opinions they express. In an ERISA claim like this one in which Oliver seeks benefits under 29 U.S.C. § 1132, under *de novo* review, without any deference to the plan administrator's denial, the court, as fact finder, is required to use its best judgment, limited to the

17

written record.  No physician has opined under oath on the question of whether Oliver was or is "disabled", using the two precise definitions of "disability" set forth in the Plan.  If this were a full scale *de novo* non-jury trial on the merits of a garden variety insurance claim, the court could examine or cross-examine under oath all of the medical experts, and could examine Oliver himself, exploring his "training, education and experience" to see how his training, education and experience might affect his claim of disability twenty-four months after his accident.  Without this possibility, the court must look carefully at what it has before it.  In doing this, the court arrives at the conclusion that during the first twenty-four months after his accident, Oliver was continuously "disabled from performing his normal duties for his employer", and that after the said first twenty-four months until the present, Oliver has been "disabled continuously from engaging in any occupation for wages or profit for which he is reasonably qualified by training, education or experience".

## Conclusion

Based on the foregoing, Broadspire's and Coca-Cola's motions for summary judgment will be denied by separate order, and Oliver's motion for summary judgment will be granted against both defendants.  The judgment will be limited to a resolution of the question of liability *vel non*, with the amount of past due benefits

18

to be computed either by agreement of the parties, or by the filing
of opposing affidavits on the damages question.

DONE this 21st day of October, 2005.

_____
WILLIAM M. ACKER, JR.
UNITED STATES DISTRICT JUDGE